**SOUTHWESTERN BELL TELEPHONE, L.P.,**
Plaintiff,

v.

**Brian MOLINE, et al., Defendants,**

**AT & T Communications of the Southwest, Inc., Intervenor.**

**No. 04–2247–JWL.**

United States District Court,
D. Kansas.

Aug. 18, 2004.

As Amended Aug. 23, 2004.

---

Bruce A. Ney, Melanie N. Sawyer, Timothy S. Pickering, Topeka, KS, Colin S. Stretch, Eli C. Schulman, Michael K. Kellogg, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for Plaintiff.

Caleb Stegall, Robert A. Fox, Foulston Siefkin LLP, Topeka, KS, for Intervenor Plaintiff.

Harvey A. Levin, Birch, Horton, Bittner & Cherot, PC, Washington, DC, Eva Powers, Martha J. Coffman, Corporation Commission, Topeka, KS, for Defendants.

## ORDER NUNC PRO TUNC

LUNGSTRUM, Chief Judge.

On August 17, 2004, the court issued an order granting plaintiff's motion for a preliminary injunction. The court hereby attaches to this order an amended memorandum and order that simply corrects two typographical errors appearing on pages 13 and 30 of the order filed on August 17, 2004.

## MEMORANDUM AND ORDER

This lawsuit arises from an order and a related order on reconsideration issued by the Kansas Corporation Commission (the Commission) which established policies for win, winback, and retention offerings by incumbent local exchange carriers (ILECs).[1] Plaintiff Southwestern Bell Telephone, L.P. (Southwestern Bell) is an ILEC, and filed this lawsuit challenging the aspects of that order that uniquely inhibit its ability to offer winback promotional discounts, entirely prohibit Southwestern Bell from making discounted offers to retain existing customers or to win new ones, and also prohibit Southwestern Bell from directly contacting customers for marketing purposes for thirty days after the customer switches service to a competing carrier.

The matter is presently before the court on Southwestern Bell's motion for a preliminary injunction (doc. 2). By way of this motion, Southwestern Bell seeks an order enjoining the Commission from enforcing the thirty-day restriction on direct winback solicitations on the grounds that the restriction violates Southwestern Bell's First Amendment commercial speech rights. The parties have advised the court that their written submissions complete the record on this matter, and therefore they do not desire oral argument or an

---

1. The defendants in this action are Brian Moline, Robert Krehbiel, and Michael Moffet in their official capacities as commissioners of the Kansas Corporation Commission. At the time that the Commission issued the order and the related order on reconsideration that are at issue in this lawsuit, the commissioners were Messrs. Moline, Krehbiel, and John Wine, and those are the three individuals who were originally named as defendants in this action. Subsequently, the court allowed Mr. Moffet to be substituted as a defendant in this matter for Mr. Wine because, since this action was commenced, Mr. Moffet has been sworn in to replace Mr. Wine as a commissioner.

evidentiary hearing. Accordingly, the court has thoroughly evaluated the parties' briefs, memoranda, and evidentiary exhibits, and the court is now prepared to rule.

The court will grant Southwestern Bell's motion because Southwestern Bell has carried its burden of demonstrating that the four factors the court must evaluate in considering whether to issue a preliminary injunction all weigh in favor of issuing the injunction. Specifically, Southwestern Bell has demonstrated a likelihood of success on the merits because the Commission has failed to present evidence that the thirty-day restriction will directly and materially advance the Commission's substantial interest in fostering a competitive climate in the local exchange carrier (LEC) market in Kansas or that the restriction is narrowly tailored given the fact that there are obvious, non-speech-infringing alternatives to advance the Commission's asserted interest. Further, Southwestern Bell is faced with the threat of irreparable harm if the injunction is not issued by virtue of the loss of its First Amendment rights as well as the fact that it probably would not have an effective remedy after a full trial on the merits. The balance of harms weighs in Southwestern Bell's favor because the harm to Southwestern Bell if the injunction is not issued outweighs the harm that the injunction might cause to the Commission, given the Commission's failure to present evidence to justify the restriction, as well as any competitive harm that intervenor AT & T of the Southwest, Inc. (AT & T) might suffer during the interim. Further, issuing the injunction will further the public interest of protecting First Amendment commercial speech rights. Accordingly, the court will enjoin the Commission from enforcing the thirty-day restriction on direct winback solicitations pending a trial on the merits of this case.

## I. *Background*

Until the 1990s, most local telephone service was provided in Kansas and elsewhere by a single, highly regulated company such as Southwestern Bell with an exclusive franchise to provide this service. The Telecommunications Act of 1996 (the "1996 Act") replaced this system with competitive local telephone service. Under the 1996 Act, Congress put in place a series of discrete, wholesale duties on ILECs such as SWBT to assist competitive local exchange carriers (CLECs) with their efforts to compete in the local market. Specifically, Congress required ILECs to provide "unbundled access" to discrete pieces of their network so that CLECs could purchase those facilities at regulated, wholesale rates. *See* 47 U.S.C. § 251(c)(3). Congress also required ILECs to provide CLECs with finished retail services at a wholesale discount so that CLECs could resell those services under their own brand names. *Id.* § 251(c)(4).

Prior to 2002, Southwestern Bell had received approval from the Commission to make winback and retention (i.e., offers to be made available to customers thinking of leaving Southwestern Bell for a CLEC) promotional offers, and Southwestern Bell had heavily marketed those promotions. Even so, CLECs increased their market share in Kansas by more than 200% during the time that these promotional offers were in place. According to the Commission, the number of phone lines served by Southwestern Bell competitors jumped 484%, or 152,233 lines, from 1999 to 2002. In 2002 alone, CLECs almost doubled their share of the local market, a rate of growth that far exceeded the national average.

In March 2002, the Commission stopped approving Southwestern Bell's promotions and it initiated an investigation into

whether ILECs should be allowed to offer winback or retention promotions. The Commission's investigation was originally intended to encompass promotions by both ILECs and CLECs, but the Commission subsequently narrowed its investigation to include only ILEC offerings. On April 2, 2004, the Commission issued the order that gave rise to this lawsuit. *See* Order 18: Establishing Policy for Win, Winback, and Retention Offerings by Incumbent Local Exchange Carriers [hereinafter the *Order*]. In the *Order,* the Commission concluded that winback discounts benefit consumers and therefore are in the public interest. *Order* ¶ 34, at 17. Accordingly, the *Order* authorized ILECs such as Southwestern Bell to offer winback discounts as long as those discounts do not take Southwestern Bell's prices below a floor intended to prevent predatory pricing. *Id.* ¶¶ 49, 65–69, at 24, 30–32. Although the Commission authorized ILECs to offer winback discounts, the Commission concluded (over a dissent by defendant commissioner Robert Krehbiel) that Southwestern Bell should not be allowed to contact a customer directly to inform the customer of the discounts for thirty days after the customer switches service to a CLEC. *Id.* ¶ 81, at 37–38. The Commission stated that this "short waiting period" would "address many of the concerns raised in [the] docket." *Id.* The Commission further explained that

> [t]his time period will allow the CLEC to develop a relationship with the customer, to work out any complications that arose during the conversion of service, and to serve the customer during at least one billing cycle. Also, the waiting period will ensure no misuse of customer information, as discussed later in this Order.

*Id.* Although the restriction prohibits "direct solicitation of a specific CLEC customer," it "does not prohibit contact with customers that occurs as a result of gener-

al media advertising or mass mailings." *Id.* The *Order* further provided that the thirty-day winback restriction would expire, or sunset, on July 1, 2005, unless the Commission takes further action to extend it. *Id.* ¶ 82, at 38.

Southwestern Bell immediately sought reconsideration of the Commission's order, contending in relevant part that the thirty-day restriction on direct winback solicitations infringes its First Amendment commercial speech rights under *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 564–66, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The Commission stated that it disagreed, and denied Southwestern Bell's motion for reconsideration. *See* Order 20: Denying Petitions for Reconsideration and Granting Clarification of Order 18 [hereinafter the *Order on Reconsideration*]. In the *Order on Reconsideration,* the Commission stated that it has a substantial state interest in promoting competition in the telecommunications market by "ensuring that consumers realize the benefits of competition through increased services and improved telecommunications facilities and infrastructure at reduced rates" and addressing "problems a customer can experience when an incumbent converts to service by a competitor." *Id.* ¶¶ 22–23, at 10–11. The Commission further explained that the thirty-day restriction directly and materially advances that interest by addressing some of the problems that CLECs discussed they had experienced in their efforts to enter a competitive environment and it

> ensures that a customer has an opportunity to experience the quality of service a competitor can provide before being inundated with direct offerings from the incumbent.... By imposing a short waiting period, a customer will experience the new provider's service and ability to solve problems before it receives a

direct solicitation from its form [sic] provider. This allows the customer to develop a relationship—albeit a short one—with the new provider before the incumbent can directly solicit the customer.

*Id.* ¶ 25, at 11–12. The Commission also stated that the thirty-day restriction is no more extensive than necessary because the Commission adopted the shortest time proposed by the parties (thirty days rather than the proposed sixty or 120–160 days); because the Commission stated that the thirty-day restriction would sunset on July 1, 2005; and because the Commission placed no restrictions on an ILEC's ability to conduct general media advertising or mass mailings. *Id.* ¶¶ 26–27, at 12–13.

Southwestern Bell filed this lawsuit challenging the thirty-day restriction on direct winback solicitations as well as various other aspects of the Commission's *Order* and *Order on Reconsideration.* Southwestern Bell contends that the thirty-day restriction violates its First Amendment commercial speech rights, and that the various provisions in the *Order* and *Order on Reconsideration* generally violate section 253(a) of the Telecommunications Act of 1996, 47 U.S.C. § 253(a), as well as the Supremacy Clause of the United States Constitution. The component of that lawsuit that is currently before the court is Southwestern Bell's motion for a preliminary injunction in which Southwestern Bell asks the court to enjoin the Commission from enforcing the thirty-day restriction on direct winback solicitations on the grounds that the restriction violates Southwestern Bell's First Amendment rights.

## II. *Standard for a Preliminary Injunction*

■ A party seeking a preliminary injunction has the burden of establishing: " '(1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest.' " *Salt Lake Tribune Publ'g Co. v. AT & T Corp.,* 320 F.3d 1081, 1099 (10th Cir.2003) (quoting *Kikumura v. Hurley,* 242 F.3d 950, 955 (10th Cir.2001)). A preliminary injunction is an extraordinary remedy that should not be issued unless the movant's right to relief is clear and unequivocal. *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1188 (10th Cir.2003); *Salt Lake Tribune Publ'g Co.,* 320 F.3d at 1099.

## III. *Discussion and Analysis*

For the reasons explained below, the court finds that Southwestern Bell is entitled to a preliminary injunction because, based on the record at this procedural juncture, Southwestern Bell has demonstrated that all four of these factors weigh in its favor. Southwestern Bell has demonstrated a likelihood of success on the merits because, although the Commission has a substantial governmental interest in promoting a competitive environment in the LEC market, the Commission has failed to present any evidence beyond pure conjecture and speculation to suggest that the thirty-day restriction will in fact directly and materially advance that interest or that the restriction is narrowly tailored to achieve its asserted interest. In addition, Southwestern Bell is faced with the threat of irreparable harm if the injunction is not issued by virtue of the loss of its First Amendment rights as well as the potential loss of customers. The balance of harms weighs in Southwestern Bell's favor because these harms to Southwestern Bell outweigh the harm to the Commission, given the Commission's failure to justify the restriction, as well as the competitive harm that AT & T argues it will suffer if the injunction is issued. Further, issuing the

injunction will further the public's interest in protecting First Amendment commercial speech rights.

### A. *Likelihood of Success*

■ The First Amendment protects commercial speech that concerns lawful activity and that is not misleading. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. In this case, the parties agree that the speech at issue concerns a lawful activity that is not misleading, and therefore the restriction must be evaluated under the three-part *Central Hudson* test. *See id.; see also Mainstream Mktg. Servs., Inc. v. FTC,* 358 F.3d 1228, 1236 (10th Cir.2004) ("In reviewing commercial speech regulations, we apply the *Central Hudson* test."). Under this test,

> [f]irst, the government must assert a substantial interest to be achieved by the regulation. Second, the regulation must directly advance that governmental interest, meaning that it must do more than provide only ineffective or remote support for the government's purpose. Third, although the regulation need not be the least restrictive measure available, it must be narrowly tailored not to restrict more speech than necessary. Together, these final two factors require that there be a reasonable fit between the government's objectives and the means it chooses to accomplish those ends.

*Mainstream Mktg. Servs.,* 358 F.3d at 1237 (internal quotations and citations omitted); *see also Utah Licensed Beverage Ass'n v. Leavitt,* 256 F.3d 1061, 1066 (10th Cir.2001) (discussing these same three factors); *U.S. West, Inc. v. FCC,* 182 F.3d 1224, 1233 (10th Cir.1999) (same). "The party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 71 n. 20, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *accord Utah Licensed Beverage Ass'n,* 256 F.3d at

1070–71; *see also U.S. West,* 182 F.3d at 1234 ("We therefore proceed directly to whether *the government has satisfied its burden* under ... the *Central Hudson* test." (emphasis added)).

#### 1. Substantial Governmental interest

■ The Commission asserts that the governmental interest that it relies upon to support the thirty-day restriction is its substantial interest in ensuring a climate for competition in the telecommunications market in Kansas. *See* K.S.A. § 66–2001(b) (declaring the public policy of ensuring that consumers throughout the state of Kansas realize the benefits of competition). Southwestern Bell has a legacy as a monopoly and it still dominates the LEC market in Kansas. The Commission contends that it is likely that Southwestern Bell's aggressive use of winback promotions may benefit consumers in the short term, but those winback promotions will have the long-term adverse effect of inhibiting a competitive climate in the market because they will create insurmountable barriers to CLECs who attempt to compete with Southwestern Bell's dominant market power. In other words, the Commission has an interest in fostering a competitive environment in the LEC market.

In *Turner Broadcasting System, Inc. v. FCC,* the Supreme Court held that promoting fair competition in the television programming market is an important governmental interest. 520 U.S. 180, 189–90, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). The Courts of Appeals have followed suit and recognized that the FCC has an important governmental interest in promoting competition in the industries that it regulates. *See, e.g., SBC Communications, Inc. v. FCC,* 154 F.3d 226, 247 (5th Cir.1998) (applying *Turner* and holding "competition-enhancing interests ... are

manifestly sufficient to meet" the first prong of *Central Hudson*); *BellSouth Corp. v. FCC*, 144 F.3d 58, 70 (D.C.Cir. 1998) (applying *Turner* and holding the requirement of an important governmental interest was "amply met" by the asserted interest of promoting competition by limiting the ability of Bell operating companies to provide electronic publishing); *Time Warner Entm't Co. v. FCC*, 93 F.3d 957, 978 (D.C.Cir.1996) (holding the government had an important interest in promoting fair competition in the video marketplace by regulating vertically integrated programmers and operators). Likewise, in *U.S. West*, although the Tenth Circuit reasoned that it was unpersuaded that the interest in promoting competition was a significant consideration underlying the statutory provision that was at issue in that case, the court nevertheless recognized that a governmental interest in promoting competition in the telecommunications industry is, in the abstract, a legitimate and substantial governmental interest. 182 F.3d at 1234–37.

In this case, the court is persuaded that the Commission identified a legitimate and substantial governmental interest to promote competition in the LEC industry in Kansas when it enacted the thirty-day restriction on direct winback solicitations. In the *Order*, the Commission recognized the legislature's "goal to transition the telecommunications industry from a monopoly environment to a competitive environment," *Order* ¶ 71, at 33, and stated that "the market is nascent and still developing," *id.* ¶ 37, at 18. The Commission established the thirty-day restriction to "allow the CLEC to develop a relationship with the customer, to work out any complications that arose during the conversion of service, and to serve the customer during at least one billing cycle." *Id.* ¶ 81, at 37. The *Order* also provided that the thirty-day restriction would sunset on July 1, 2005, in order to further the transition to a

competitive market for basic local telephone service. *Id.* ¶ 82, at 38. That way, CLECs and other competitors would have an opportunity to enter the market, and incumbents such as Southwestern Bell would know that those restrictions would not be in place indefinitely. *Id.* Thus, the court is satisfied that the Commission has advanced a substantial governmental interest that satisfies the first prong of the *Central Hudson* test.

In Southwestern Bell's motion for a preliminary injunction, it contends that the Commission relied on two additional interests to justify the thirty-day ban, namely encouraging Southwestern Bell to provide nondiscriminatory wholesale service to CLECs and protecting confidential information. In the Commission's memorandum in opposition to Southwestern Bell's motion for a preliminary injunction, however, the Commission clarifies that the only *substantial* governmental interest that it relies upon is fostering a competitive environment in the LEC market, and that potential misuse of confidential information was not a substantial interest that the Commission relied upon when it adopted the thirty-day restriction. With respect to the Commission's interest in encouraging Southwestern Bell to provide nondiscriminatory wholesale service, the Commission simply stated that the thirty-day waiting period would allow CLECs a period of time to work out any complications that might arise during the conversion of service, thus allowing customers the opportunity to truly assess the service provided by CLECs. The Commission therefore relies on this interest only insofar as it is a means to further the substantial governmental interest of fostering a competitive environment in the LEC market. Thus, the only substantial governmental interest asserted by the Commission is fostering a competitive environment in the LEC market, and, for the reasons

explained above, the court is persuaded that this is indeed a substantial governmental interest. Accordingly, the court will evaluate the Commission's other rationale for the restriction only insofar as they are a means to achieve this interest.

Southwestern Bell also contends that winback offerings are decidedly pro-competitive, and therefore any restrictions on those offerings are anti-competitive. The Commission does not dispute that winback offerings are pro-competitive. Rather, the parties diverge on this issue in the sense that Southwestern Bell is looking at the anticipated short-term effects of winback marketing whereas the Commission focused on the long-term effects. Ultimately, Southwestern Bell's argument in this regard goes to the issue of whether the thirty-day ban directly advances the Commission's asserted interest, not to the issue of whether the Commission in fact has a substantial interest in fostering a competitive environment in the LEC market among ILECs and CLECs alike. With this argument in mind, then, the court will address what seems to be the crux of the parties' dispute—that is, whether the Commission has demonstrated the requisite fit between its substantial interest in fostering a competitive environment in the LEC market and the thirty-day ban on direct winback solicitations.

### 2. Directly and Materially Advance the Interest

■ Under the next prong of the *Central Hudson* test, the court must evaluate whether the governmental restriction "directly and materially" advances this substantial state interest. To satisfy this burden, "the government must 'demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *U.S. West,* 182 F.3d at 1237 (quoting *Edenfield v. Fane,* 507 U.S. 761, 771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), and *Rubin v. Coors Brewing*

*Co.,* 514 U.S. 476, 487, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995)). A commercial speech regulation "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson,* 447 U.S. at 564, 100 S.Ct. 2343. The party seeking to uphold the restriction on commercial speech carries the burden of justifying it. *Utah Licensed Beverage Ass'n,* 256 F.3d at 1070–71 (quoting *Bolger,* 463 U.S. at 71 n. 20, 103 S.Ct. 2875). A governmental entity may not meet its burden on this issue by presenting evidence that consists of nothing more than mere speculation and conjecture. *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 507, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (holding the state failed to meet its burden where the Court would have had to engage in speculation or conjecture in order to find that a statute prohibiting advertisement of liquor prices would directly advance the state's asserted interest in reducing alcohol consumption); *Edenfield,* 507 U.S. at 770–71, 113 S.Ct. 1792; *Utah Licensed Beverage Ass'n,* 256 F.3d at 1071; *U.S. West,* 182 F.3d at 1237. Nevertheless, "[t]he government is not limited in the evidence it may use to meet its burden. For example, a commercial speech regulation may be justified by anecdotes, history, consensus, or simple common sense." *Mainstream Marketing Services, Inc. v. FTC,* 358 F.3d 1228, 1237 (10th Cir.2004).

■ As discussed previously, the Commission's justification for the thirty-day restriction is to ensure a competitive environment in the LEC market. The Commission disputes any suggestion that it adopted the thirty-day restriction in order merely to shield CLECs from competition and it insists that its goal was simply to ensure a competitive environment in the LEC market. The thirty-day restriction clearly is designed to allow CLECs to penetrate and gain presence in the market

by helping them retain former customers of Southwestern Bell, which is the entrenched, dominant carrier. The Commission seeks to accomplish this by giving CLECs a thirty-day "safe harbor" to attempt to establish customer relationships without interference from Southwestern Bell. The theory is that customers will ultimately benefit in the long run because the restriction will help CLECs gain a competitive foothold in the market and hence customers will be able to choose from among a more meaningful array of local exchange carriers.

On the record currently before the court, however, the Commission has failed to meet its burden of establishing that the thirty-day restriction will actually directly and materially advance its asserted interest in ensuring that the market is served by a variety of carriers. Although the Commission has directed the court's attention to some evidence, discussed *infra,* suggesting that the thirty-day restriction indeed might help CLECs be able to retain former customers of Southwestern Bell, the Commission has nevertheless failed to cite *any* evidence suggesting that the thirty-day restriction is necessary to allow CLECs to survive in the market. This distinction is critical. Given the Commission's asserted interest in ensuring that CLECs will be able to survive in the market so that customers will have the opportunity to choose from among a more meaningful array of local exchange carriers, the Commission's burden is not to prove that the thirty-day restriction would allow CLECs to retain *individual* former Southwestern Bell customers. Rather, the Commission must show that the thirty-day restriction would allow CLECs to survive in the market when they would otherwise (i.e., without the thirty-day restriction) effectively be deterred from entering the market or be forced out of the market altogether. In other words, there is presumably a threshold below which the vari-

ous CLECs would decline to serve the market because it is not cost effective for them to do so. The Commission has not cited any evidence on this issue such as, for example, the level of market presence that CLECs must be able to achieve in order to stay in the market, whether they have already achieved an adequate market share, whether they expect to do so, or whether they expect to pull out of the market absent the thirty-day restriction. In sum, the Commission has not cited any evidence that its theorized harm is real— that is, that customers will suffer from a lack of meaningful choice among carriers absent the thirty-day restriction on Southwestern Bell's direct winback solicitations. This lack of evidence is critical, and indeed dispositive, at this procedural juncture.

In fact, the only evidence in the record refutes the theory that the thirty-day restriction is necessary to allow a variety of CLECs to serve the market. When Southwestern Bell was previously allowed to engage in winback marketing without the thirty-day restriction in place, CLECs substantially increased their market presence. Prior to 2002, Southwestern Bell had received approval from the Commission for several winback promotional offers. According to the Commission, during this same time period from 1999 to 2002, residential phone lines served by Southwestern Bell competitors jumped 484% or 152,233 lines, their market share grew 20%, and Southwestern Bell lost 245,898 lines, which was a 26% decline. According to the rebuttal testimony of Edwardo Rodriquez that was given in the proceedings before the Commission, the market share of CLECs jumped by more than 200% from 84,823 lines in June of 2000 to 258,312 lines in December of 2002. Thus, it appears that CLECs were gaining market presence even when Southwestern Bell was allowed to make winback offers without the thirty-day restriction. South-

western Bell, by contrast, then, has directed the court to historical evidence that the thirty-day restriction is unnecessary to allow CLECs to increase their presence in the market.

The Commission nevertheless attempts to justify the restriction on the basis that it would "address many of the concerns raised" in the administrative proceedings before the Commission. *Order* ¶ 81, at 37. To this end, in its memorandum in opposition to Southwestern Bell's motion for a preliminary injunction, the Commission declares that it relied upon "problems that can arise when an incumbent makes winback offerings while still the dominant carrier in the market place," *Order on Reconsideration* ¶ 23, at 10; *Order* ¶¶ 47–48, at 23–24; the fact that customers might blame CLECs for problems that occur when incumbents convert service to competitors, *Order on Reconsideration* ¶ 24, at 11; *Order* ¶ 78, at 36; and the desire to ensure that customers have an opportunity to experience the quality of service a competitor can provide and to develop a relationship with the competitor before being inundated with direct offerings from the incumbent, *Order on Reconsideration* ¶ 25, at 11–12; *Order* ¶ 78, at 36. In support of these arguments, the Commission cited to relatively generic testimony by CLECs that advocated waiting periods. This testimony consists of nothing more than speculation about what *might* happen if Southwestern Bell were allowed to engage in unrestricted winback marketing.

The Commission also cited testimony by the Citizens' Utility Ratepayer Board (CURB) in which CURB advocated a sixty-day waiting period. CURB witness Michael D. Lura recommended a sixty-day waiting period because it would "allow[ ] the CLEC time to complete at least one billing cycle with [its] new customer." CURB also devoted approximately one page in the brief that it submitted to the Commission in which it argued, via conclusory arguments unsupported by citations to any evidence other than the minimal testimony provided by Mr. Lura on this issue, that the sixty-day period would allow CLECs to at least partially recover their start-up costs associated with setting up new customers and address any start-up implementation problems, and it would also allow customers time to realize the value of CLECs' services. While this position postulates that the thirty-day restriction might theoretically help CLECs in their efforts to increase their market presence, CURB's arguments essentially consist of unsupported speculative assertions about how the thirty-day restriction *might* benefit CLECs by allowing them to retain customers. Moreover, even if CURB's arguments are correct that the thirty-day restriction might help CLECs to be able to retain customers, this evidence nevertheless suffers from the fatal flaw that it does not speak to the critical issue in this case, which is whether and to what extent CLECs would decline to serve the market absent the thirty-day restriction.

The Commission also attempts to justify the restriction on the grounds that various specific ills are presumably inhibiting CLECs from being able to retain new customers who were formerly Southwestern Bell customers. Specifically, the Commission points to evidence in the record concerning: (1) Southwestern Bell's use of an anti-slamming message; (2) Southwestern Bell's alleged "perverse incentive" to provide substandard wholesale service when customers are switching to CLECs because customers *might* blame CLECs for those problems; and (3) and CLECs' concerns that Southwestern Bell could misuse confidential customer information. Again, the court finds that this evidence does not justify the restriction for the threshold critical reason that these considerations pertain to the issue of CLECs'

ability to retain individual former Southwestern Bell customers, not to the issue of whether these alleged tactics by Southwestern Bell will effectively run CLECs out of the market and thereby deprive consumers of a choice from among local exchange carriers. In addition, though, the record reflects that each of these concerns are either unfounded (i.e., not real) and/or that alleviating these concerns would not directly and materially advance the Commission's asserted interest in promoting a competitive environment in the LEC market.

First, the Commission argues that one of the problems that can arise when an incumbent makes winback offerings is exemplified by evidence in the record of Southwestern Bell's use of an anti-slamming message. As explained by the Commission:

> Staff noted SWBT gives this warning through a voice message or by letter to all customers who switch local, local toll, or long distance service to another carrier. Staff expressed concern about this practice of warning customers that they may have been slammed and then giving them a toll free number to call if they did not authorize the switch.... If a customer calls the number provided in the message, a SWBT retail marketing representative is reached.

*Order* ¶ 103, at 46. The Commission concluded "that use of a recorded message or direct mailing about slamming that directs a CLEC customer to call a number that is answered by a SWBT retail marketing representative is improper and must stop immediately." *Id.* ¶ 106, at 47. The Commission found that the message was misleading in that it directed customers to a marketing representative, as opposed to a customer service representative. *Id.* Accordingly, the Commission ordered that

"[i]f SWBT or any carrier wants to provide a public service call about the possibility of slamming, the message should direct the caller to a customer service representative that can assist in determining whether slamming has occurred, not to a marketing representative." *Id.*

The problem with the Commission's reliance on this evidence is that there is no nexus between the Commission's directive pertaining to these types of anti-slamming messages and the thirty-day restriction on direct winback solicitations. The *Order* reveals that the Commission considered the two issues to be separate and distinct because, even with the thirty-day restriction in place, Southwestern Bell is permitted to send these anti-slamming messages to its former customers as long as the messages invite consumers to contact a customer service representative rather than a marketing representative. The Commission found that Southwestern Bell's anti-slamming practice was contrary to the public policy of protecting telecommunications customers "from fraudulent business practices and practices that are inconsistent with the public interest, convenience, and necessity." *Order* ¶ 106, at 47 (citing K.S.A. § 66-2001(e)). There is no suggestion in the *Order* or in the Commission's memorandum in opposition to Southwestern Bell's motion for a preliminary injunction that the Commission considered this slamming message to be evidence that Southwestern Bell has a propensity to engage in inappropriate marketing tactics that inhibit a competitive environment in the LEC market.[2]

Second, the Commission argues that customers might blame CLECs for problems that occur when incumbents convert service to CLECs. In support of this

---

**2.** The court will also discuss in more detail below why it believes that this consideration

does not pass muster under the narrow tailoring prong of the *Central Hudson* test.

argument, the Commission has submitted performance measurement tracking graphs which suggest that Southwestern Bell may provide lower quality service when it is servicing CLECs' new or switching customers than it does when it is servicing its own customers, and therefore CLECs and their customers encounter competitive disadvantages caused by Southwestern Bell's interconnection practices in the periods immediately following carrier switching.

Southwestern Bell has, however, submitted evidence that is more informative and by far more persuasive on this issue in the form of an affidavit from William R. Dysart, who is the director of performance measurements for Southwestern Bell. According to Mr. Dysart, the Commission relied on only a few narrow slices of data to argue that Southwestern Bell's wholesale performance has been substandard while neglecting overwhelming evidence that Southwestern Bell's wholesale performance in Kansas, considered in the aggregate, has been outstanding. For example, the Commission cites a subset of Performance Measurement (PM) 35, specifically PM 35–08, that reflects a unique type of service that CLECs order only infrequently and that does not encompass the vast bulk of CLEC ordering activity. When evaluating ten submeasures rather than the single PM 35–08 submeasure cited by the Commission, Southwestern Bell provided parity service to CLECs during the last twelve months that was actually better at times than the service Southwestern Bell provided to its own retail operations. Similarly, the Commission's criticism regarding the installation quality of 8.0dB loops is based on a handful of trouble reports coupled with low CLEC order volumes, which tends to magnify the apparent effect of isolated performance shortfalls. Actually, Southwestern Bell's performance results for CLECs were comparable to, or superior to, Southwestern Bell's retail results in eight of the twelve months in the Commission's study period. Also, the evidence cited by the Commission ignores performance data for all other loop types. During the twelve-month study period at issue, Southwestern Bell completed only 1,600 CLEC orders in Kansas for 8.0dB loops, whereas it completed 269,770 UNE–P change and conversion orders, and CLECs' UNE–P change and conversion orders generated an installation trouble report rate of 0.38% compared to a *higher* trouble rate of 0.85% by Southwestern Bell's retail customers. Mr. Dysart's affidavit discredits the Commission's argument that Southwestern Bell has provided substandard wholesale switching service to CLECs in additional ways, as well, but suffice it to say that the court is persuaded that the Commission relied on isolated performance data that inaccurately portrays the quality of wholesale service that Southwestern Bell provides to CLECs, which appears on balance to be just as good as the quality of service that it provides to its own retail customers. In sum, the Commission's concerns that Southwestern Bell might provide substandard wholesale switching service to CLECs is simply contrary to the evidence.[3]

Third, the Commission argues that CLECs were concerned that Southwestern Bell could misuse CLEC proprietary information. The CLECs' concerns on this issue, however, are not based on any evidence of wrongdoing by Southwestern Bell and are based entirely on speculation and conjecture. The Commission itself commented that although these concerns would be addressed by the thirty-day re-

---

**3.** The court will also discuss in more detail below why it also believes that this consider-

ation does not pass muster under the narrow tailoring prong of the *Central Hudson* test.

striction, the concerns were nonetheless unfounded:

> The Commission understands the CLECs' concern that SWBT's personnel has the ability to misuse CPNI [Customer Proprietary Network Information] in competitive behavior. However, the Commission will not assume that such inappropriate behavior is inevitable. If a competitor has evidence suggesting the misuse of CPNI by SWBT or any ILEC, it should bring this to the Commission's attention. In the absence of such evidence relating to SWBT, the Commission finds that CLECs can gain access to the same information SWBT's retail employees have available through the LDR and the LLN report. These reports are made available to CLECs at the same time, or earlier, than SWBT's report is made available to its retail operation.... The Commission concludes that CLECs have equal access to information SWBT provides its retail operation and that SWBT's code of business conduct for employees adequately protects this information.

*Order* ¶ 102, at 45. Thus, the Commission has not presented any evidence that the thirty-day restriction directly and materially advances the Commission's interest in creating a competitive environment in the LEC market by ensuring that Southwestern Bell does not misuse confidential customer information. In fact, it appears that CLECs have equal access to this information.

The Commission also points out that the public utilities commissions in Ohio and Illinois have implemented similar thirty-day restrictions on winback solicitations and have rejected arguments that these restrictions violate regulated entities' First Amendment commercial speech rights. Of course, the restrictions in place in Ohio and Illinois and the factual record on which they were based are not at issue in this lawsuit. Moreover, the argument that "everybody's doing it" would not make an unsupported restriction on speech any lesser of a First Amendment violation. While the court certainly acknowledges that these analogous restrictions might have some evidentiary value, *see, e.g., Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (recognizing that "in other First Amendment contexts, [the Supreme Court has] permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether"), the Commission has not directed the court's attention to any evidence that was presented to the public utilities commissions in those other states that would justify the restriction at issue in this case.

In sum, the Commission has failed to meet its burden of showing that the thirty-day restriction on direct winback solicitations will directly and materially advance the Commission's asserted interest in ensuring a competitive environment in the LEC market. The court wishes to reiterate and emphasize that the shortcoming of all of the evidence cited by the Commission is that it shows, at most, that the thirty-day restriction might help CLECs be able to retain new customers by providing them with a thirty-day safe harbor from Southwestern Bell's winback marketing efforts. What this evidence does *not* show is that CLECs would be unwilling or unable to serve the market absent this thirty-day safe harbor, thus depriving consumers of the opportunity to choose from among a variety of local exchange carriers. Although the court may have latitude to rely on "simple common sense," *Mainstream Marketing Services, Inc. v. FTC,* 358 F.3d 1228, 1237 (10th Cir.2004), it is simply not a matter of common sense to conclude that CLECs are going to pull out of the market altogether simply because they are being forced to compete for cus-

tomers. In fact, common sense would seem to suggest just the opposite. CLECs undoubtedly entered the market because they were lured by the prospect of profitability and they probably anticipated being forced to vie for the business of former Southwestern Bell customers. The court would be required to engage in impermissible conjecture and speculation in order to draw the inference that CLECs are going to abandon the market if they are not afforded a thirty-day safe harbor from Southwestern Bell's marketing efforts. Despite all of the Commission's various arguments, then, it has not presented any evidence that the harm it recites—i.e., that the market will suffer from a lack of local exchange carriers if Southwestern Bell is allowed to inform its former customers about winback offers—is real. Further, while the court can appreciate the Commission's interest in making sure that CLECs are not faced with substantial barriers that will prevent the Kansas LEC market from becoming a truly competitive one, the Commission simply has not directed the court's attention to any evidence from which the court can infer that the thirty-day restriction on direct winback solicitations will in fact alleviate the asserted harm to a material degree by allowing the LEC market to flourish with competitors who would be forced out of the market if Southwestern Bell were allowed to engage in unrestricted winback marketing. *See, e.g., Utah Licensed Beverage Ass'n v. Leavitt,* 256 F.3d 1061, 1073–75 (10th Cir. 2001) (holding the government failed to show that its speech regulations directly and materially advanced its interests

where the regulatory scheme was irrational and the government failed to demonstrate that the harms it recited were real or that the regulations would reduce those harms to a material degree); *U.S. West, Inc.,* 182 F.3d at 1237 (holding the FCC had failed its burden of demonstrating that the harms it recited were real and that the restriction would in fact alleviate those harms to a material degree where the government simply pointed to conjecture to justify the restrictions). Accordingly, Southwestern Bell has demonstrated a likelihood of success on the merits of its First Amendment claim because the thirty-day restriction does not pass muster under this prong of the *Central Hudson* test.[4]

### 3. Narrowly Tailored

██ The last prong of the *Central Hudson* test is that the regulation must be narrowly tailored to advance the governmental interest. *Mainstream Mktg. Servs., Inc. v. FTC,* 358 F.3d 1228, 1238 (10th Cir.2004). This "requires a reasonable fit between the means and ends of the regulatory scheme." *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 561, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001). This does not mean that the regulation must be the least restrictive means of achieving the interest, but only that it must be narrowly tailored to meet the desired objective in the sense that it is a proportional response. *Mainstream Mktg. Servs.,* 358 F.3d at 1238 (citing *Board of Trs. of State Univ. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). "Whether

4. The court recognizes the possibility that the record of the administrative proceedings before the Commission might contain additional evidence on this issue, but the court has considered all of the evidence in the administrative record that was cited by the Commission in its memorandum in opposition to Southwestern Bell's motion for a preliminary injunction. In light of the fact the Commission bears the burden of justifying the restriction, the court declines to scour the entirety of the administrative record, which is three feet thick, for additional evidence that might conceivably satisfy the Commission's burden on this issue.

or not there are 'numerous and obvious less-burdensome alternatives' is a relevant consideration ...." *Id.* at 1242 (citing *Florida Bar v. Went for It, Inc.,* 515 U.S. 618, 632, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995)). The fact that options exist that could advance the government's interest in a manner that does not infringe First Amendment rights indicates that the challenged statute is more extensive than necessary. *Utah Licensed Beverage Ass'n,* 256 F.3d at 1075 (quoting *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 491, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995)). Also, there must be evidence that the state carefully calculated the costs and benefits associated with the burden on speech imposed by the regulations. *Id.* (quoting *Lorillard Tobacco Co.,* 533 U.S. at 561, 121 S.Ct. 2404). In applying these legal standards, the court finds that Southwestern Bell is also likely to prevail on the merits because the thirty-day restriction is not narrowly tailored to advance its interest in fostering a competitive environment in the LEC market.

The thirty-day restriction is certainly not narrowly tailored to advance the Commission's interest in creating a competitive climate in the LEC market by addressing the Commission's concern regarding Southwestern Bell's anti-slamming messages. The Commission referred to such anti-slamming messages as "public service" calls. *Order* ¶ 106, at 47. Thus, the Commission apparently recognized that these types of messages further laudable goals and therefore are not problematic in and of themselves. The only aspect of Southwestern Bell's anti-slamming message that the Commission considered to be problematic was that the message was misleading insofar as it directed a consumer who believed that he or she had been the victim of slamming to contact a Southwestern Bell marketing representative rather than a Southwestern Bell customer service representative. The Commission remedied the negative aspect of that anti-slamming message by ordering Southwestern Bell "or any carrier [who] wants to provide a public service call about the possibility of slamming [to] direct the caller to a customer service representative ... not to a marketing representative." *Id.* This simple directive is an obvious non-speech-infringing alternative that addressed the Commission's concern regarding the misleading aspect of Southwestern Bell's anti-slamming message. Further, it is undisputed that Southwestern Bell abided by and is continuing to abide by the Commission's directive on this issue. Given the Commission's power to alleviate this concern by issuing a simple directive, then, the thirty-day restriction on direct winback solicitations does not accomplish anything further in terms of alleviating any concerns the Commission may have once had regarding Southwestern Bell's anti-slamming message. In sum, the thirty-day restriction is not narrowly tailored because there is an obvious, less-burdensome, non-speech-infringing alternative that already addresses this concern.

The thirty-day restriction is also not narrowly tailored to advance the Commission's interest in creating a competitive climate in the LEC market by eliminating Southwestern Bell's hypothesized perverse incentive to provide poor quality switching service because customers will view CLECs as being accountable for service interruptions. According to an uncontroverted affidavit of William Dysart, Southwestern Bell already has in place a performance monitoring and remedy plan approved by the Federal Communications Commission (the FCC) that tracks Southwestern Bell's performance of its wholesale obligations. This plan consists of over seven hundred measurements and submeasurements that allow state and federal regulators as well as CLECs to monitor and evaluate Southwestern Bell's wholesale performance in the aggregate,

as well as on a CLEC–by–CLEC basis. These measurements track, for example, trouble reports, the speed with which Southwestern Bell responds to CLEC orders, and how often Southwestern Bell misses installation commitments. The plan includes a self-executing remedy component that requires monetary payments to CLECs and/or the Kansas state treasury if Southwestern Bell provides poor wholesale service. The FCC has found that these remedies discourage anti-competitive behavior because the penalties are set at a level above the simple cost of doing business. For example, when Southwestern Bell is generally providing substandard wholesale service, it is faced with $650 to $1,300 in penalties for each instance when it provides inferior service to a CLEC. The apparent magnitude of these financial penalties, then, undercuts the hypothesis that it would be in Southwestern Bell's interest to botch a customer's changeover of service to a CLEC in the hopes that Southwestern Bell might have a chance to win the customer back. Quite simply, it appears that Southwestern Bell already has an adequate incentive to ensure that customers who transition service to CLECs enjoy smooth transitions. The court is unpersuaded, then, that the Commission has carried its burden of proving that the thirty-day restriction is narrowly tailored because there is an obvious, less-burdensome, non-speech-infringing alternative that already addresses this concern.

The Commission contends that the thirty-day restriction is narrowly tailored because it is only for thirty days whereas some of the CLECs had proposed much longer periods of time; because the restriction sunsets on July 1, 2005; and because ILECs can still conduct general media advertising or send out mass mailings to promote winback offerings during the thirty-day period. These considerations, however, are insufficient to render the thirty-day restriction narrowly tailored for two reasons.

First, "a regulation of speech cannot be sustained unless there is evidence that the state carefully calculated the costs and benefits associated with the burden on speech imposed by the regulations." *Utah Licensed Beverage Ass'n,* 256 F.3d at 1075 (internal quotations omitted). Here, despite the Commission's conclusory statement in its *Order on Reconsideration* that it adopted the thirty-day restriction "after careful consideration of costs and benefits associated with the burdens imposed by this restriction," ¶ 28, at 24, there is no evidence that the Commission actually gave any consideration to, let alone attempted to carefully calculate, the costs to Southwestern Bell that are associated with the thirty-day restriction. Thus, the Commission's argument that it attempted to minimize the burden on Southwestern Bell by limiting the restriction to only thirty days, by including a sunset provision, and by allowing Southwestern Bell alternative marketing outlets is not particularly persuasive given the fact that it appears the Commission had no idea how these considerations would alleviate the burden imposed by the thirty-day restriction. *See, e.g., See Lorillard Tobacco Co.,* 533 U.S. at 561–62, 121 S.Ct. 2404 (holding a restriction on commercial speech was not narrowly tailored because there was no evidence that the governmental entity carefully calculated the costs associated with the burden on speech imposed by the regulations); *Utah Licensed Beverage Ass'n,* 256 F.3d at 1075 (same).

Second, it is well settled that "where the state's legitimate interests may be promoted through methods that do not restrict speech, those methods must be preferred over speech restrictions." *Utah Licensed Beverage Ass'n,* 256 F.3d at 1075. For the reasons discussed previously, the court is

persuaded that all of the Commission's interests can be promoted via methods that do not restrict speech. The Commission has already exercised its authority to correct Southwestern Bell's misleading anti-slamming messages. Also, the self-executing remedy component of Southwestern Bell's performance monitoring plan assures CLECs that Southwestern Bell will provide them with parity wholesale switching service. Further, the Commission had obvious non-speech-infringing alternatives to advance what appears to have been its overriding goal of allowing CLECs to have an opportunity to increase their market presence by shielding them from competition from Southwestern Bell. The Commission could have accomplished this goal by pursuing the obvious alternative of not allowing Southwestern Bell to offer winback solicitations at all, just as the Commission declined to allow Southwestern Bell to make retention or win offerings. The Commission also apparently has the power to regulate the terms of Southwestern Bell's winback promotional offers as evidenced by the fact that the *Order* prohibits ILECs from pancaking promotional offerings, from offering winback promotions that contain term provisions exceeding one year, and from using predatory pricing in its winback promotions. Thus, the Commission "has not shown that nonspeech regulations would be an ineffective means to accomplish the ends it desires, or that its speech regulations are no more extensive than necessary." *Id.* (holding a restriction on commercial speech failed the narrowly tailored prong because the state failed to show that non-speech-infringing alternatives would have been ineffective); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507–08, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (plurality op.) (holding the availability of non-speech-infringing alternatives indicated the commercial speech restriction was more extensive than necessary);

*Coors*, 514 U.S. at 490–91, 115 S.Ct. 1585 (same).

The Commission has failed to meet its burden of demonstrating that there is a reasonable fit between the thirty-day restriction on direct winback solicitations and the governmental interest of fostering a competitive environment in the LEC market in Kansas. Accordingly, Southwestern Bell has also demonstrated a likelihood of success on the merits of its First Amendment claim because the thirty-day restriction does not pass muster under this last prong of the *Central Hudson* test.

**B. *Irreparable Harm***

■ "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir.2001). The Supreme Court has held that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality op.). The court must, however, "consider the specific character of the First Amendment claim." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir.2003). When the deprivation of commercial speech rights is involved, a presumption of irreparable injury arises. *Utah Licensed Beverage Ass'n*, 256 F.3d at 1076; *see also Kikumura*, 242 F.3d at 963 ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable. injury is necessary."). Thus, Southwestern Bell is presumptively suffering and. will continue to suffer irreparable injury by virtue of the thirty-day restriction because it results in the loss of Southwestern Bell's First Amendment commercial speech rights.

The Commission contends that the presumption of irreparable injury, however, is only that—a presumption. The Commission argues that Southwestern Bell will not suffer irreparable injury because it has alternatives available to reach customers during the thirty-day time period inasmuch as the prohibition only applies to *direct* winback solicitations, and therefore Southwestern Bell may still offer *indirect* winback solicitations by way of general advertising via the radio, television, newspapers, or mass mailings. Southwestern Bell, however, has submitted an affidavit from Jeffrey Urbanek, executive director of consumer voice services for SBC Communications Inc., who is responsible for strategic direction and tactical implementation for marketing Southwestern Bell's core services. Mr. Urbanek's affidavit states that Southwestern Bell's success rate in sending out a winback solicitation letter four days after a customer switches service is eighty percent higher than the success rate for all other winback solicitation letters that are typically sent out at ten– to twenty-day intervals beginning at forty days and ending at one hundred days after the customer switches service. The affidavit also states that in Mr. Urbanek's experience such generalized advertising campaigns provide a far less efficient mechanism for making customers aware of Southwestern Bell's winback offers. Thus, it appears that the restriction largely deprives Southwestern Bell of the most effective avenues to market its winback offers, which the parties do not dispute are in and of themselves decidedly pro-competitive. The Commission has failed to present any evidence to the contrary. Accordingly, even if the Commission is correct that the presumption of irreparable injury is a rebuttable one, the Commission has nevertheless failed to rebut that presumption with any evidence to suggest that general, indirect winback solicitations are an adequate substitute for direct winback solicitations.

Moreover, as Southwestern Bell points out, it is faced with the threat of irreparable injury by virtue of the loss of its customers to competitors. A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain. *Kikumura*, 242 F.3d at 963. Again, based on Mr. Urbanek's affidavit in which he states that winback solicitation letters that are sent out only four days after customers switch service have a substantially higher success rate than all other subsequent winback solicitation letters combined suggests that it would indeed be difficult to ascertain the customers that Southwestern Bell would lose by virtue of the thirty-day ban on direct winback solicitations vis-a-vis the customers that Southwestern Bell would have been able to retain had it been permitted to engage in such solicitations. Moreover, it may very well be that Southwestern Bell will not be able to obtain any monetary remedy from the Commission. Thus, the evidence suggests that from a financial standpoint, in addition to from a First Amendment rights standpoint, Southwestern Bell will likely suffer irreparable injury if the thirty-day ban remains in place because the court would be unable to grant Southwestern Bell any effective monetary remedy after a full trial on the merits. *See, e.g., Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156–57 (10th Cir.2001) (holding the district court did not abuse its discretion in finding irreparable harm where the plaintiff's chief executive officer testified to its loss of business to the defendant); *see also, e.g., Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 595–96 (3d Cir.2002) (collect-

ing case law and finding a loss of market share constitutes irreparable harm).[5]

## C. Balance of Harms

■ With respect to the third element of the test for a preliminary injunction, this factor also weighs in favor of the court issuing the preliminary injunction. The First Amendment injury to Southwestern Bell outweighs any prospective injury to the Commission if an injunction were granted. The Commission has failed to establish that the competitive climate among LEC competitors will suffer without the thirty-day restriction on direct winback solicitations. Because the Commission has failed to demonstrate that the restriction directly and materially advances that interest, then, there is no reason to think that the Commission will suffer more harm than Southwestern Bell if the court enjoins the Commission from enforcing the restriction.

AT & T urges the court to also consider the harm that it will suffer if the court issues the preliminary injunction. AT & T argues that the Commission's *Order* establishing the thirty-day restriction on direct winback solicitations "is vital to enable small carriers such as AT & T to establish the merest of beachheads with new customers i[n] their attempt to be competitive in the territory." AT & T contends that it will likely lose a significant portion of its investment in the territory because AT & T is not capable of competing with Southwestern Bell's "superior network and database resources without a *small* regulatory 'safe harbor' in which to establish fragile customer relationships" (emphasis in original). The court can certainly appreciate AT & T's concern that it does not believe it can compete with Southwestern Bell's dominant market power. Notably, though, AT & T has not provided the court with any evidence to support these allegations. In this context, then, when viewed in isolation from the actual or likely impact on the competitive nature of the market, AT & T is not entitled to enjoy the windfall of a competitive safe harbor at the expense of Southwestern Bell's constitutional rights being violated. The court therefore finds that the competitive hardship that AT & T might suffer is outweighed by the potential violation of Southwestern Bell's rights during the interim.

## D. Public Interest

■ Lastly, the court must consider whether an injunction would be adverse to the public interest. It is in the public interest to vindicate First Amendment rights by enjoining the enforcement of statutes and regulations that unconstitutionally infringe free speech rights. *Utah Licensed Beverage Ass'n,* 256 F.3d at 1076; *Elam Constr., Inc. v. Reg'l Transp. Dist.,*

---

5. The court's finding that Southwestern Bell is faced with the threat of irreparable injury by virtue of the loss of its customers to competitors is not inconsistent with the court's holding that the Commission failed to establish that the thirty-day restriction will directly and materially advance its interest in fostering a competitive environment in the LEC market. The irreparable injury that Southwestern Bell has presented evidence that it is faced with is the irreversible loss of individual customers by virtue of not being allowed to make any effective attempts to win those customers back, although it is lawfully entitled to do so. In that sense, any loss of customers that is irretrievable causes irreparable harm to Southwestern Bell regardless of its impact on the market. By comparison, as explained previously, the issue of whether the thirty-day restriction advances the Commission's asserted interest must focus on the extent to which there is evidence that the various local exchange carriers would be induced to leave the market absent the thirty-day restriction. In this case, the Commission has failed to present any evidence that any of the CLECs would be inclined to leave the market even if Southwestern Bell were allowed to attempt to win back its former customers through direct winback solicitations in the first thirty days.

129 F.3d 1343, 1347 (10th Cir.1997) ("The public interest also favors plaintiffs' assertion of their First Amendment rights."). Further, the protection that the First Amendment affords to accurate and non-misleading commercial messages such as Southwestern Bell's winback offers is grounded in the public's interest in receiving accurate commercial information. *44 Liquormart, Inc.,* 517 U.S. at 496, 116 S.Ct. 1495. Thus, the court finds that issuing an injunction that will allow Southwestern Bell to effectively disseminate information about its winback offers is in the public interest.

## IV. *Conclusion*

 In conclusion, the court is persuaded that Southwestern Bell has met its burden of proving that all four of the preliminary injunction factors weigh in its favor. The court is certainly mindful that the Commission is charged with ensuring a competitive telecommunications market in Kansas and the court would ordinarily defer to the Commission's reasonable determination of how best to foster this competition. *See generally, e.g., Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Such deference, however, is not appropriate where agency action is conclusively unconstitutional or raises serious constitutional questions, *U.S. West, Inc. v. FCC,* 182 F.3d 1224, 1231 (10th Cir.1999), as is the case here. Further, in the seminal case of *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Supreme Court rejected the argument that promotional advertising by a public utility is entitled to a lesser degree of protection under the First Amendment solely because of the entity's monopoly status. *See generally id.* at 566–67, 100 S.Ct. 2343. Likewise, here, Southwestern Bell's First Amendment rights to disseminate lawful and nonmisleading commercial speech are not to be ignored simply because Southwestern Bell still enjoys a dominant market position in the Kansas telecommunications market. If the Commission is to achieve its goal of fostering a competitive telecommunications market in Kansas, it must demonstrate that it is doing so in a manner that does not infringe Southwestern Bell's commercial speech rights.

**IT IS THEREFORE ORDERED BY THE COURT** that Southwestern Bell's motion for a preliminary injunction (doc. 2) is granted. Accordingly, the Commission is enjoined from enforcing the thirty-day restriction on direct winback solicitations pending a decision on the merits of this case.